UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| JAMES HEISEL,<br><br>              Plaintiff,<br>v.<br><br>PHARMACOSMOS, INC., and<br>PHARMACOSMOS THERAPEUTICS,<br>INC.,<br><br>              Defendants. | |

Plaintiff James Heisel brings this action against Defendants Pharmacosmos, Inc. and Pharmacosmos Therapeutics, Inc., alleging breach of contract, violation of North Carolina Wage and Hour Act, tortious interference with contract, negligent hiring and retention, slander per se, and declaratory relief, and, under oath, he avers and alleges the following:

### THE PARTIES

1. Plaintiff James Heisel ("Plaintiff" of "Heisel") is a resident of Charlotte, Mecklenburg County, North Carolina.

2. Defendant Pharmacosmos, Inc. ("Defendant" or "PI") is a New Jersey corporation, with its registered agent and office located at Susan A. Navarro, 776 Mountain Boulevard, STE. 101, Watchung, New Jersey 07069.

3. Defendant Pharmacosmos Therapeutics, Inc. ("PTI") is a Delaware corporation, with its registered agent and office located at Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, Delaware 19904.

4. Defendants PI and PTI are referred to collectively herein as "Defendants."

5. Plaintiff is informed and believes that at all relevant times all Defendants and each of them, were and are the agents, servants, employees, joint venturers, alter egos, and/or partners of each of the other Defendants, and were, at all such times, acting within the course and scope of their employment and/or agency; and that each and every Defendant, while acting as a high corporate officer, director, and/or managing agent, principal and/or employer, expressly directed, consented to, approved, affirmed, and ratified each and every action taken by the other co-Defendants, as herein alleged, and was responsible in whole or in part for the matters referred to herein.

6. Plaintiff is further informed and believes that Defendants, and each of them, are now and/or at all relevant times were members of and/or engaged in a joint venture, partnership, and common enterprise, and were acting within the course and scope of, and in pursuit of that joint venture, partnership, and common enterprise and, as such, were co-employers of Plaintiff during all relevant times described herein.

7. Plaintiff is further informed and believes that Defendants, and each of them, at all relevant times concurred with, contributed to, approved of, aided and abetted, condoned, and/or otherwise ratified the various acts and omissions of each and every one of the other Defendants in proximately causing the injuries and/or damages alleged in this Complaint.

2

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between Plaintiff and Defendants, Plaintiff is a citizen of North Carolina, and further, the amount in controversy, exclusive of interest and costs, exceeds $75,000.

9. This Court has personal jurisdiction over Defendants because it was, at all times mentioned herein, engaged in substantial activity within North Carolina and their acts or omissions gave rise to Plaintiff's injury, which occurred in North Carolina.

10. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

11. On November 26, 2012, Plaintiff entered into an Employment Agreement with Defendant, hired by Defendant PI as a National Sales and Business Director.

12. In that Employment Agreement, Defendants agreed not terminate Plaintiff without cause, as follows:

> **Termination Without Cause:** In the event of termination of employment without cause your severance shall be:
> - within the first 6 months of employment, a lump-sum equivalent to one months base salary
> - after 6 months of employment, a lump-sum amount equivalent to two (2) months of your annual base salary ("Lump Sum"), plus two (2) weeks for each year of service paid out through salary continuance up to a maximum of six (6) months ("Salary Continuance"). Your benefits will terminate at the end of the Salary Continuance period for each year of service paid out through salary continuance up to a maximum of six (6) months ("Salary Continuance"). Your benefits will terminate at the end of the Salary Continuance period.
>
> **Termination With Cause:** In the event of termination of employment with cause, your

3

employment shall terminate without severance or any notice or pay in lieu thereof.

13. For over 12 years, Plaintiff performed satisfactorily at his job without any issues.

14. Indeed, Plaintiff enjoyed satisfactory performance under the former VP Jens Fabricius, former VP and current CEO Tobias Christensen, former VP Soren Bank, and former VP Michael Ryde.

15. On or about On March 6, 2025, during global Pharmacosmos Animal Health team meeting conducted on Teams, Plaintiff's manager, Christian Lindquist Madsen, and the Senior International Sales & Marketing director, Christian von der Recke-Heisel, announced a plan to host live baby pigs on the Pharmacosmos headquarters campus as part of the Pharmacosmos 60th Anniversary Celebrations, chaired by Madsen. The plan included building a temporary outdoor pig pen containing approximately 6 live baby pigs of approximately 6 weeks of age, which Pharmacosmos would purchase from a commercial-scale pig farm in Denmark. The baby pigs' purpose was for Pharmacosmos employees from around the world attending the celebration to hold, handle, and take pictures with the baby pigs.

16. Upon hearing of the plan, Plaintiff communicated his concerns as it relates to the biosecurity consequences that would necessitate the euthanasia of the baby pigs at the conclusion of the one-day 60th anniversary celebration inclusion of baby pigs. During the Teams meeting or immediately thereafter, Plaintiff shared with the meeting participants a link to an article with global reach regarding a recent Danish art display's inclusion of baby pigs, with the display intending to cage the baby pigs in a suspended manner that would intentionally deprive the baby pigs of water and nutrition until mortality.

17. During the Teams meeting, Plaintiff expressed his deep concerns and objections to being affiliated with a similar global negative PR event involving intentional euthanasia of baby pigs solely for the amusement of humans. Under Danish, US, and most First World pig-raising countries, biosecurity rules and standards, the baby pigs could not and would not be eligible for re-entry and rearing in a commercial pig farm, as humans are the primary vector of disease (viral, bacterial, and other) introduction into commercial farms.

18. Madsen and von der Recke-Heisel were fully aware of the mortal consequences of the inclusion of baby pigs at the 60th anniversary and were fully informed of Plaintiff's moral and ethical objections, his concern for his potential personal and professional consequences of being affiliated with the plan to use baby pigs for human entertainments that would knowingly result in the unnecessary death of the baby pigs and the potential for a PR disaster in the event an animal rights group were to learn about the plan to include baby pigs in the 60th anniversary event.

19. Despite Plaintiffs' concerns, Madsen and von der Recke-Heisel proceeded with the plan, going to such measures as to register the Pharmacosmos campus in Holbaek as a pig farm with Danish authorities under the name of von der Recke-Heisel's name.

20. On information and belief, the registration of pig farms in Denmark obligates the registered party to abide by humane and ethical practices contrary to the intentions of Pharmacosmos to intentionally cause pig death as a consequence of human entertainment purposes.

21. Less than two weeks after voicing his concerns during the March 6, 2025, Global Animal Health team meeting, on March 19, 2025, Masden unexpectedly held a meeting with

Plaintiff to verbally voice his concerns with Plaintiff's performance. This meeting was followed by a formal written Performance Management document on March 21.

22. The Performance Management document sets out Defendants' disciplinary process as including the following levels: 1) Verbal Correction; 2) Warning Letter; 3) Performance Improvement Plan; and 4) Termination.

23. The Performance Management identifies that Plaintiff is on the *first step* of the disciplinary process, a Verbal Warning. It further notes that Plaintiff has not received any prior disciplinary notifications.

24. The Verbal Correction begins by stating: "First, I want to acknowledge the strong value you bring to Pharmacosmos. Your deep industry knowledge, strategic relationships, and commitment to Uniferon's market leadership are truly appreciated. Your contributions have been instrumental in strengthening our position, and I strongly believe we have a prosperous future together. However, there are fundamental areas where I need to see improvement."

25. The Verbal Correction next lists areas of improvement, which contain inaccurate and/or false information about Plaintiff.

26. Furthermore, the March 21, 2025 Verbal Correction reaches back well into the past, referencing performance issues that purportedly occurred in August of 2024, November of 2024, December of 2024 and January of 2025. In fact, the Verbal Correction does not reference a single contemporaneous performance issue that would have triggered the sudden Verbal Correction. To wit, there is no mention of any performance issues in either February or March of 2025.

27. Moreover, Madsen was not even present at some of the meetings he complains about. In fact, he did not attend the January meeting in Banff nor the Hoelbaek meeting, both mentioned in the Verbal Correction.

28. The Verbal Correction concludes by identifying the "Outcomes and Consequences" as: Positive: If you meet your performance goals, no further disciplinary action will be taken regarding this issue. Negative: You are now being placed on Warning. Significant, immediate and sustained improvement in your performance is expected. If your performance does not improve to an acceptable level, or there are any other performance issues or policy infractions further corrective action up to and including termination may occur. Next Scheduled Review Date of the performance improvement plan: 60 days, or sooner if necessary.

29. After the March 21, 2025 Verbal Correction, Plaintiff did not receive any further performance corrections. He also worked diligently to improve any areas identified in the Verbal Correction.

30. However, on May 16, 2025, Defendants terminated Plaintiff's employment without any warning or additional disciplinary actions taken.

31. The termination letter states that Plaintiff is being terminated, not for performance issues, but for his purported conduct at the annual distributor partner meeting on May 5, 2025.

32. Specifically, the termination letter states that according to feedback from his team, Plaintiff "appeared disheveled, unprofessional, and incoherent, prompting some participants to perceive you as being intoxicated." The letter further states that, "[w]hen issues of this nature are brought forward, we take them seriously and are obligated to escalate them and evaluate the appropriate next steps."

33. However, between May 5, 2025 and May 16, 2025, Plaintiff was not contacted about any concerns regarding his behavior or appearance on May 5, 2025. Additionally, Plaintiff was the only Pharmacosmos employee present at the annual distributor partner meeting. If there was any type of investigation regarding Plaintiff's supposed intoxication or disheveled appearance, Plaintiff was not made a part of it.

34. In addition, Defendants deemed Plaintiff to have been terminated "for cause" and refused to pay him any severance under the terms of the Employment Agreement.

35. Plaintiff was not intoxicated on May 5, 2025, and this stated basis for his termination is a fabricated "for cause" reason to avoid paying Plaintiff the amount required by the severance provision.

36. Not coincidentally, the 60th Anniversary event Plaintiff objected to was held June 16-20, 2025, 30 days after Plaintiff's wrongful termination. Based on information and belief, the live pig display took place as planned, and the baby pigs were euthanized as planned promptly after the one-day inclusion of the baby pig "photo op."

37. Plaintiff's stating his moral and ethical objections were a material part of Madsen issuing the Performance Document with false allegations and subsequent wrongful termination prior to the event that Madsen chaired and MC'd.

38. As Plaintiff tried to explain, piglets, like all mammals, are sentient in that they experience stress, fear, and pain. Using them purely for a photo opportunity treats them instrumentally rather than as living creatures with their own welfare interests. Since the piglets are later killed only because the event ends or because they have "served their purpose," that violates the moral expectation that animals' lives and suffering have independent value. This

8

Case 3:25-cv-00998-MOC-WCM    Document 1    Filed 12/17/25    Page 8 of 18

conflicts with nearly all modern animal-welfare frameworks, which stress that animals should not be caused suffering or death for trivial human goals.

39. It is the public policy of North Carolina to protect animals from cruelty. Chapter 19A, Article 1 is entitled "Civil Remedy for Protection of Animals." N.C. Gen. Stat. § 19A-2 provides that, "[i]t shall be the purpose of this Article to provide a civil remedy for the protection and humane treatment of animals in addition to any criminal remedies that are available and it shall be proper in any action to combine causes of action against one or more defendants for the protection of one or more animals."

40. The public policy is also reflected in North Carolina criminal statutes. G.S.§ 14-360 makes cruelty to animals a crime (Class 1 misdemeanor; felonies in aggravated cases), reflecting a legislative stance against cruelty.

41. On information and belief, Denmark (where the gratuitous killing of the piglets occurred) also has a public policy against killing animals for trivial human goals, like one-day photo opportunities.

42. Defendants thereafter posted Plaintiff's position on Indeed for a much lower salary, even though Defendants' increased the geographical territory for the position.

## COUNT I

### (Breach of Contract)

43. The allegations contained in the foregoing paragraphs are realleged and incorporated by reference herein.

44. On or about November 26, 2012, Plaintiff entered into a written Employment Agreement with Defendant Pharmacosmos, Inc. ("PI"), to serve as National Sales and Business

9

Case 3:25-cv-00998-MOC-WCM    Document 1    Filed 12/17/25    Page 9 of 18

Director.

45. The Employment Agreement provided that Plaintiff could not be terminated without cause and that, in the event of termination "without cause," Plaintiff would be entitled to severance as follows:

- Within the first six months, one month's base salary;
- After six months, a lump-sum equal to two (2) months of annual base salary, plus two (2) weeks for each year of service paid through salary continuance, up to a maximum of six (6) months, together with continued benefits through the continuance period.

46. The Employment Agreement further provided that, in the event of termination "with cause," employment would terminate without severance or notice.

47. Plaintiff fully performed all contractual duties for approximately fifteen years. His performance was consistently satisfactory under the supervision of multiple VPs and executives, including Jens Fabricius, Tobias Christensen, Søren Bank, and Michael Ryde.

48. Plaintiff received no prior disciplinary warnings or performance issues during his long tenure.

49. On March 6, 2025, during a global Pharmacosmos Animal Health team meeting conducted via Microsoft Teams, Plaintiff's manager, Christian Lindquist Madsen, and the Senior International Sales & Marketing Director, Christian von der Recke-Heisel, announced plans for the company's upcoming 60th Anniversary Celebration to include live six-week-old piglets on the company's Holbæk headquarters campus as a photo opportunity for visiting employees.

50. Plaintiff immediately raised concerns about biosecurity, animal-welfare, and reputational risks, explaining that under Danish, U.S., and global commercial swine standards, piglets handled by humans would have to be euthanized afterward because of infection-control protocols.

51. Plaintiff also shared a news article describing a prior Danish art display in which pigs were intentionally deprived of water and food, leading to public outrage and reputational harm, to illustrate the severe ethical and public-relations risks of Pharmacosmos's plan.

52. Plaintiff objected to the proposal on moral, ethical, and professional grounds, stating his unwillingness to be associated with an event that would result in the intentional killing of animals for human amusement.

53. Madsen and von der Recke-Heisel acknowledged Plaintiff's objections but nevertheless proceeded, even registering the Pharmacosmos campus as a "pig farm" under von der Recke-Heisel's name to facilitate the acquisition of piglets.

54. Less than two weeks after Plaintiff's protected objections, on March 19, 2025, Madsen summoned Plaintiff to an unexpected meeting and criticized his performance—despite 15 years of exemplary service.

55. On March 21, 2025, Madsen issued a written Performance Management document designating a "Verbal Correction." The document recycled old allegations from August 2024 to January 2025, none of which had ever been raised contemporaneously, and contained false or misleading claims.

56. Plaintiff worked diligently to address the purported concerns, and no further corrective actions were taken thereafter.

57. Nevertheless, on May 16, 2025, Defendant terminated Plaintiff's employment without warning.

58. The termination letter alleged that at a May 5, 2025, distributor meeting, Plaintiff "appeared disheveled, unprofessional, and incoherent," and that some participants "perceived [him] as intoxicated."

59. These allegations were false; Plaintiff was not intoxicated and no contemporaneous investigation, interview, or corroboration was performed.

60. Defendant characterized the termination as "for cause," thereby refusing to pay the contractual severance owed for termination without cause.

61. On information and belief, the stated reason was pretextual, created to punish Plaintiff for his ethical objections and to avoid severance liability before the planned piglet display.

62. By fabricating a cause and denying severance, Defendants breached the Employment Agreement.

63. As a direct and proximate result, Plaintiff suffered economic damages, including lost severance pay, benefits, back pay, and consequential losses.

## COUNT II

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

64. The allegations contained in the foregoing paragraphs are realleged and incorporated by reference herein.

65. The Employment Agreement contained an implied covenant of good faith and fair dealing, requiring Defendants not to act in bad faith or to deprive Plaintiff of the contract's benefits.

66. Defendants acted in bad faith by, including but not limited to:

    a. Issuing a pretextual "Verbal Correction" immediately after Plaintiff's protected objections;

    b. Compiling fabricated performance issues from prior months;

    c. Terminating Plaintiff under false pretenses of intoxication;

    d. Failing to follow its own disciplinary process; and

    d. Misclassifying the termination as "for cause" to evade severance obligations.

67. These actions were willful, dishonest, and retaliatory, depriving Plaintiff of the compensation and job security promised under the Employment Agreement.

68. As a direct result, Plaintiff sustained economic loss and reputational harm.The Employment Agreement is a valid contract that existed between Plaintiff and Defendants.

69. In doing the acts alleged herein, Defendants injured Plaintiff's right to benefits under the Employment Agreement by depriving him of the fruits of his bargain with Defendants.

70. Plaintiff suffered damage as a result of Defendants' conduct in an amount to be proved at trial.

71. In doing the acts alleged above, Defendants acted with actual malice, fraud and/or oppression, entitling Plaintiff to an award of punitive damages.

## COUNT III

**(Violation of North Carolina Wage and Hour Act)**

72. The allegations contained in the foregoing paragraphs are realleged and incorporated by reference herein.

73. In the Employment Agreement, Defendants, and each of them, promised to pay Plaintiff a severance for a separation without cause.

74. Plaintiff honored his obligations under the Employment Agreement but Defendants failed to pay Plaintiff the severance as promised.

75. The amounts promised to Plaintiff but not paid by Defendants constitute "wages" under N.C. Gen. Stat. § 95-25.2(16).

76. Defendants failed to pay Plaintiff all wages due as required by the North Carolina Wage & Hour Act. Plaintiff is entitled to recover from Defendants all unpaid wages which he is owed, plus interest at the legal rate set forth in N.C. Gen. Stat. § 24.1 from the date such amount first came due. N.C. Gen. Stat. § 95.25.22(a).

77. Plaintiff is also entitled to recover from Defendants all costs and fees of this action and his reasonable attorney's fees under N.C. Gen. Stat. § 95-25.22(d).

## COUNT IV

**(Wrongful Termination in Violation of Public Policy)**

78. The allegations contained in the foregoing paragraphs are realleged and incorporated by reference herein.

79. North Carolina recognizes a cause of action for termination that contravenes clear public policy.

80. The State's public policy explicitly condemns cruelty to animals and affirms their humane treatment, as reflected in: N.C. Gen. Stat. § 19A-2, declaring that the purpose of Article 1 is "to provide a civil remedy for the protection and humane treatment of animals," and N.C. Gen. Stat. § 14-360, criminalizing acts of cruelty toward animals.

81. Plaintiff's refusal to acquiesce in, and his objections to, a company plan that would lead to the gratuitous killing of healthy piglets for entertainment were consistent with this public policy.

82. By firing Plaintiff for asserting these objections, Defendants retaliated against conduct protected by North Carolina's public policy.

83. The termination also conflicts with international and Danish animal-welfare policy, including Denmark's Animal Welfare Act No. 133 of 2020, § 1, which seeks "to promote good animal welfare, including protecting animals, and to promote respect for animals as living and sentient beings."

84. Defendants' conduct, if left unchecked, would chill employees from reporting or objecting to animal cruelty or other unethical acts.

85. Plaintiff's termination, therefore, constitutes a wrongful discharge in violation of public policy.

86. Plaintiff suffered loss of income, benefits, emotional distress, and reputational injury as a direct result.

87. In doing the acts alleged above, Defendants acted with actual malice, fraud and/or oppression, entitling Plaintiff to an award of punitive damages.

## COUNT V

### (Slander Per Se)

88. The allegations contained in the foregoing paragraphs are realleged and incorporated by reference herein.

89. In or about May of 2025, Defendants made the aforementioned defamatory statements to colleagues, vendors and customers, regarding the alleged reasons for Plaintiff's termination, including but not limited to, that he was intoxicated on the job.

90. The statements were false, made without investigation, and were known or should have been known to be false, which tended to prejudice Plaintiff in his reputation, office, trade, business and means of livelihood, holding Plaintiff up to disgrace, ridicule and contempt.

91. The statements were published or communicated to and understood by a third person to refer to Plaintiff.

92. The false accusations of intoxication were defamatory per se, as they impute unfitness and moral turpitude in Plaintiff's profession.

93. As a direct and proximate result, Plaintiff suffered humiliation, emotional distress, and loss of future employment opportunities. Defendants are liable to Plaintiff for all damages resulting from the defamation in an amount to be determined at trial.

94. In doing the acts alleged above, Defendants acted with actual malice, fraud and/or oppression, entitling Plaintiff to an award of punitive damages. The statements were made maliciously and recklessly, intending to justify Plaintiff's termination and tarnish his professional reputation.

## COUNT VI

### (Declaratory Relief)

95. The allegations contained in the foregoing paragraphs are realleged and incorporated by reference herein.

96. Under N.C. Gen. Stat. § 1-253, Plaintiff is a person interested under a written Employment Agreement whose rights, status, and/or other legal relations are affected by the Employment Agreement entered between him and the Defendant on November 26, 2012.

97. Under N.C. Gen. Stat. § 1-253 *et seq.*, Plaintiff seeks a declaratory judgment that the Employment Agreement is valid and enforceable.

98. Under N.C. Gen. Stat. § 1-253 *et seq.*, Plaintiff seeks a declaratory judgment that the 2012 Employment Agreement is the operative agreement and that Plaintiff is nonetheless entitled to severance because there was no cause to terminate his employment.

99. Under N.C. Gen. Stat. § 1-253 et seq., Plaintiff seeks a declaratory judgment that Defendant's failure to comply with the provisions of the Employment Agreement prior to terminating Plaintiff constituted a breach of the Employment Agreement as a matter of law and that Plaintiff is therefore entitled to all damages resulting from Defendant's breach.

100. Plaintiff further seeks a declaratory judgment that the "Non-Competition" clause in the Employment Agreement is unenforceable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief:

1. A declaratory judgment determining and declaring the validity and enforceability of the 2012 Employment Agreement;

2. A declaratory judgment that the Defendants' failure to comply with the 2012 Employment Agreement constituted a breach of the Employment Agreement as a matter of law;

3. A judgment awarding Plaintiff damages for the Defendants' breach of the 2012 Employment Agreement, as well as compensatory and punitive damages for slander, wrongful termination in violation of public policy and failure to pay as promised under the NCWHA.

4. An Order that the costs of this action be taxed against all Defendants;

5. An Order awarding Plaintiff reasonable attorneys' fees;

6. Pre-judgment and post-judgment interest calculated at the prevailing legal rate;

7. An Order granting any other necessary or appropriate relief to which Plaintiff is entitled under the law.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury in this action for all issues of fact and claims so triable.

*/s/ L. Michelle Gessner*
L. Michelle Gessner, NCSB#26590
GESSNER LAW, PLLC
6146 Rea Road STE B7, Box #77126
Charlotte, North Carolina 28277
Tel: (704) 234-7442; Fax: (980) 206-0286
Email: michelle@mgessnerlaw.com

*Attorney for Plaintiff*